UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ELIZABETH ANN BARKER,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

18-CV-228

DECISION AND ORDER

---

On February 12, 2018, the plaintiff, Elizabeth Ann Barker, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that she was not disabled. Docket Item 1. On December 13, 2018, Barker moved for judgment on the pleadings, Docket Item 12; on February 11, 2019, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 15; and on March 4, 2019, Barker replied, Docket Item 16.

For the reasons stated below, this Court grants Barker's motion in part and denies the Commissioner's cross-motion.

## **BACKGROUND**

### I. PROCEDURAL HISTORY

On August 1, 2013, Barker applied for both Social Security Disability Insurance ("SSDI") benefits as an adult child with a disability and Supplemental Security Income

("SSI") benefits.[1]  Docket Item 8 at 169-78.  She claimed that she had been disabled since January 1, 2012, due to bipolar disorder, posttraumatic stress disorder ("PTSD"), depression, attention deficit hyperactivity disorder ("ADHD"), and dyslexia.  *Id.* at 190.

On December 2, 2013, Barker received notice that her application was denied because she was not disabled under the Act.  *Id.* at 101-08.  She requested a hearing before an administrative law judge ("ALJ"), *id.* at 109, which was held via video conference on June 20, 2016, *id.* at 53-78.  The ALJ then issued a decision on August 24, 2016, confirming the finding that Barker was not disabled.  *Id.* at 33-47.  Barker appealed the ALJ's decision, but her appeal was denied, and the decision then became final.  *Id.* at 5.

## II. RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Barker's objection.  Barker was examined by a number of different providers but eight—an evaluator at Chautauqua County Department of Social Services; Lynn M. Dunham, M.D.; professionals at WCA Hospital; Kristina Luna, Psy. D.; professionals at Lakeshore Hospital; Michael P. Santa Maria, Ph.D.; Caillean McMahon-Tronetti, D.O.; and

---

[1] One category of persons eligible for SSDI benefits includes any adult with a disability who also is the qualified "child . . . of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual," and whose disability began before she turned 22 years old.  42 U.S.C. § 402(d)(1)(B)(ii); 20 C.F.R. § 404.350(a)(5).  SSI benefits, on the other hand, are paid to a person with a disability who also demonstrates financial need.  42 U.S.C. § 1382(a).  A qualified individual may receive both SSDI and SSI benefits, and the Social Security Administration uses the same process to determine whether an adult child is eligible for SSDI benefits that it uses to determine whether an adult is eligible for SSI benefits.  *See, e.g.*, 20 CFR § 404.1520(a)(2); *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

professionals at Niagara County Mental Health—are most significant to the claims before this Court.

### A. Chautauqua County Department of Social Services

The Chautauqua County Department of Social Services ("DSS") determined that Barker was eligible for exemption from temporary assistance work activities effective August 27, 2013. The notification form explained that "according to medical evidence," Barker "is unable to work due to a medical issue." Docket Item 8 at 289. DSS attached a Psychological and Intellectual Assessment to the exemption notice, *see id.* at 289-92, diagnosing Barker with an unspecified mood disorder, PTSD, cannabis dependence, intermittent explosive disorder, and possible bipolar disorder.[2] The evaluator opined that Barker was "moderately limited" in the areas of "performing complex tasks independently," "maintaining attention and concentration for rote tasks," "attending to a routine and maintaining a schedule," and "low stress and simple tasks." *Id.*

### B. Lynn M. Dunham, M.D.

On June 5, 2012, Lynn M. Dunham, M.D., a pediatrician, evaluated Barker. According to Dr. Dunham's notes, Barker had recently been involved in a bike-racing accident that resulted in her being taken to the emergency room and "diagnosed with a concussion." *Id.* at 562. Dr. Dunham recommended that Barker treat her ongoing pain with Motrin and massage therapy. *Id.* at 563.

---

[2] Because the final two pages of the assessment are not included in the record, *see id.*, this Court does not know the name, and cannot determine the medical qualifications, of the evaluator.

### C. WCA Hospital

On December 5, 2012, Barker was evaluated by professionals at the Outpatient Mental Health Department at WCA Hospital. Local law enforcement officers had taken Barker to the hospital on December 2, 2012, for a voluntary crisis evaluation after she refused to return home at the end of a school field trip. *Id.* at 345. Craig Scott, L.C.S.W., diagnosed Barker with an adjustment disorder "with mixed disturbance of emotions and conduct," oppositional defiant disorder, and sleep disturbance. He noted that while Barker "admit[ted] to [suicidal] threats," she "denie[d] any intent." *Id.*

On April 8, 2009, Sanjay Gupta, M.D., a psychiatrist, evaluated Barker. He diagnosed conduct disorder and recommended additional testing in the areas of attention, concentration, and learning ability. *Id.* at 344. Dr. Gupta also recommended testing to determine whether Barker had residual PTSD symptoms associated with her reported history of abuse. *Id.* Dr. Gupta again evaluated Barker on May 8, 2009, and confirmed the diagnosis of conduct disorder. *Id.* at 347.

On November 26, 2012, Barker was admitted to the WCA Hospital Inpatient Mental Health Department after she again threatened to commit suicide. *Id.* at 348. Monir A. Chaudhry, M.D., a psychiatrist, diagnosed Barker with an unspecified depressive disorder and recommended that Barker begin counseling to "master coping skills, anger management techniques and relapse prevention strategies." *Id.*

On March 1, 2013, local law enforcement took Barker back to WCA Hospital for a crisis evaluation after she threatened to harm an individual who allegedly had abused her as a child. *Id.* at 435. James Campbell, M.D., an emergency medicine physician, and Shahnawaz Meer, M.D., a child and adolescent psychiatrist, completed the evaluation. *Id.* at 435-42. During the evaluation, Barker said that she "had no thoughts

4

of wanting to harm [the individual]" and was released. *Id.* at 439. Dr. Meer recommended counseling. *Id.*

On July 12, 2013, local law enforcement again took Barker to WCA Hospital for a crisis evaluation after Barker allegedly wrote a note threatening to commit suicide. *Id.* at 313. Barker wrote on a patient intake form that she was "[b]rain dead" and "[couldn't] understand most things," *id.* at 296, and she told hospital staff that she had "significant memory def[i]cits as a result of [a bike-racing] accident," *id.* at 320. When asked about the suicide note, Barker "denie[d] any suicidal ideation." *Id.* Stacey Grimes, R.N., diagnosed Barker with adjustment disorder and recommended outpatient treatment. *Id.* at 319. Following this evaluation, Barker received counseling from Mr. Scott twice a month until at least October 2014. *Id.* at 378, 465. She continued to be seen by Dr. Meer until at least May 2014. *Id.* at 464.

On October 8, 2013, Barker was voluntarily admitted to WCA Hospital's Mental Health Clinic. *Id.* at 294. The record does not include information regarding the reason for this visit.

On February 14, 2014, Dr. Meer completed a court-ordered psychiatric evaluation of Barker. According to Dr. Meer's evaluation, Barker had threatened her boyfriend with a knife. *Id.* at 414. Dr. Meer noted that Barker "report[ed] that she [had] nightmares almost every other night" and consequently "avoid[ed] going to sleep." *Id.* at 414. He diagnosed Barker with bipolar disorder and PTSD resulting from various traumatic episodes in her life, and he prescribed an antipsychotic, Seroquel, and an antidepressant, Celexa. *Id.* at 416.

5

### D. Kristina Luna, Psy. D.

On November 21, 2013, Kristina Luna, Psy. D., completed a consultative psychological evaluation of Barker. Dr. Luna noted that Barker reported "a head injury after [bike rac]ing" and that she had been "Mercy Flighted to [Erie County Medical Center ("ECMC")] and diagnosed with a mild concussion." *Id.* at 355. Dr. Luna noted that Barker's attention and concentration were "[m]ildly impaired due to anxiety and nervousness." *Id.* at 357. She also noted that Barker's recent and remote memory skills were "[m]ildly impaired due to emotional distress secondary to anxiety and depression." *Id.* Dr. Luna opined that Barker "ha[d] no limitations in her ability to maintain a regular schedule and relate adequately with others"; was "mildly limited in her ability to follow and understand simple directions and instructions, perform simple tasks independently, and learn new tasks"; was "moderately limited in her ability to maintain attention and concentration [and to] perform complex tasks independently"; and would "need supervision [to] make appropriate decisions . . . and appropriately deal with stress." *Id.* at 358. Dr. Luna explained that Barker's "[d]ifficulties [were] caused by distractibility and substance abuse," as well as "psychiatric problems . . . [that] may significantly interfere with [her] ability to function on a daily basis." *Id.* Dr. Luna diagnosed Barker with major depressive disorder, moderate; panic disorder without agoraphobia; PTSD; cannabis dependence; and cocaine abuse in early remission. *Id.* She recommended that Barker continue psychological and psychiatric treatment. *Id.* at 359.

### E. Lakeshore Hospital

On May 10, 2014, Barker was admitted to Lakeshore Hospital for depression and anxiety. *Id.* at 445. Barker was nine weeks pregnant and "dealing with a number of traumatic issues." *Id.* at 445. Barker reported that "[s]he had been doing well with Seroquel but [stopped] once she got pregnant." *Id.* at 445. Kyle Wiktor, N.P., diagnosed Barker with an unspecified depressive disorder and marijuana dependence. *Id.* at 446.

### F. Michael P. Santa Maria, Ph.D.

On October 21, 2015, and December 8, 2015, Michael P. Santa Maria, Ph.D., a neuropsychologist, evaluated Barker. Dr. Santa Maria noted that while Barker "stated she believe[d] she was taken from the scene of the bike accident [to ECMC,] staff at ECMC informed [him] that there [was] no record of Ms. Barker having been there in 2012." *Id.* at 574. Dr. Santa Maria administered an extensive battery of psycho-cognitive tests, *see id.* at 576-77, but the record does not include the complete results or Dr. Santa Maria's assessment of those results.

### G. Caillean McMahon-Tronetti, D.O.

On April 9, 2015, Caillean McMahon-Tronetti, D.O., a psychiatrist, evaluated Barker, who had recently been charged with violating an order of protection. *Id.* at 675. Dr. McMahon-Tronetti noted Barker's prior diagnoses of "bipolar disorder depressed type, [PTSD], anxiety disorder, [attention deficit disorder], and dyslexia," but opined that her reported prior medications of Wellbutrin and Seroquel "[were] inconsistent with the[se] diagnos[es]." *Id.* at 675. Dr. McMahon-Tronetti noted that "[Barker was] attempting to get social security disability" and opined that "this may [have] influence[d]

7

the diagnos[es] she presented." *Id.* at 675. Dr. McMahon-Tronetti evaluated Barker again on January 1, 2016, and diagnosed an unspecified depressive disorder and an unspecified learning disability. *Id.* at 674.

### H. Niagara County Mental Health

From July 2015 through January 2016, while residing in Madonna House under order of a Jamestown, N.Y., treatment court, *see id.* at 721, Barker received individual psychotherapy with Laura Haseley, L.M.S.W., and medication management from Sarah Conboy, P.M.H.N.P. Intake notes document a history of "significant childhood trauma." *Id.* at 695-96. Ms. Conboy prescribed a mood stabilizer, Trileptal, and an antipsychotic, Seroquel. *Id.* at 708.

## III. THE ALJ'S DECISION

In denying Barker's application, the ALJ evaluated Barker's claim under the Social Security Administration's five-step evaluation process, which applies to both SSI claimants who are 18 years of age or older and SSDI claimants who are 18 years of age or older and claim a disability that began before attaining age 22. *See* 20 C.F.R. § 404.350(a)(5); *see also* §§ 404.1520(a)(2) (concerning SSDI); 416.920(a)(2) (concerning SSI). At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. §§ 404.1520(a)(4); 416.920(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(i). If there are no severe

8

impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. §§ 404.1520(a)(4); 416.920(a)(4).

At step three, the ALJ determines whether any severe impairment or impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the claimant's severe impairment or impairments meet or equal one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that none of the severe impairments meet or equal any in the regulations, the ALJ proceeds to step four. §§ 404.1520(a)(4); 416.920(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e); 416.920(a)(4)(iv); 416.920(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and nonsevere medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See* §§ 404.1545; 416.945

After determining the claimant's RFC, the ALJ completes step four. §§ 404.1520(e); 416.920(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. §§ 404.1520(f); 416.920(f). But if the claimant cannot, the ALJ proceeds to step five. §§ 404.1520(a)(4)(iv); 404.1520(f); 416.920(a)(4)(iv); 416.920(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. §§ 404.1520(a)(4)(v), (g); 416.920(a)(4)(v), (g). More specifically, the

9

Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ began by finding that Barker was not yet 22 on her alleged onset date, January 1, 2012, and then began the five-step process. Docket Item 8 at 38. At step one, the ALJ determined that Barker had not engaged in "substantial gainful activity" since the alleged onset date. *Id.* At step two, the ALJ found that Barker had the following severe impairments: "affective disorder; anxiety disorder; learning disability; and substance addiction disorder." *Id.* At step three, the ALJ determined that Barker "[did] not have an impairment or combination of impairments that [met] or medically [equaled] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* at 39.

At step four, the ALJ found that Barker had the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations: [she] can perform simple tasks and instructions; [she requires] occasional contact with co-workers, supervisors and the public; and [she] can tolerate occasional changes in routine." *Id.* at 40. The ALJ explained:

> The medical evidence shows a history of anxiety disorder, learning disability, and substance addiction disorder, which limits the claimant to some extent. However, the claimant's alleged severity and limiting effects from the impairments are not wholly supported by the medical evidence and tend to diminish the persuasiveness of the alleged limitations. She is inconsistent with medical treatment and medications. Her mood reportedly improved with placement at Madonna House and treatment. She reported the treatment was beneficial, despite her sporadic attendance.

*Id.* at 43. In reaching this conclusion, the ALJ assigned "considerable weight" to the opinion of Dr. Luna and "significant weight" to the opinion of Dr. McMahon-Tronetti. *Id.*

at 44. The ALJ assigned "little weight" to the opinion of the Chautauqua County DSS evaluator because Barker "was just beginning treatment . . . and [her] limitations did not remain for 12 months," and the ALJ assigned "no particular weight" to the opinion of Dr. Santa Maria because "[his] report [was] incomplete." *Id.* at 44-45. The ALJ also noted that "[a]lthough the medical evidence and the claimant's testimony indicate a history of substance abuse, the claimant's testimony indicates she is no longer using and/or abusing substances. As a result, drug addiction and alcoholism are not contributing factors material to the determination of disability." *Id.* at 45.

Finally, at step five, the ALJ determined that, in light of Barker's "age, education, work experience, and [RFC], there [were] jobs that exist[ed] in significant numbers in the national economy that [she could] perform." *Id.* at 45. Specifically, the ALJ credited the vocational expert's opinion that Barker could find and perform work as a janitor, housekeeper, or dishwasher. *Id.* at 46.

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla.

11

It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## **DISCUSSION**

### I.   **ALLEGATIONS**

Barker argues that the ALJ erred in two ways. First, she argues that the ALJ failed to fulfill her duty to develop the record. Docket Item 13-1 at 9-13. Second, she argues that the ALJ failed to adequately explain why she rejected portions of a medical source opinion in determining Barker's RFC. Docket Item 13-1 at 13-18.

This Court agrees with Barker that because the ALJ failed to adequately develop a complete medical history, Barker was denied "a full hearing under the . . . regulations." *See Moran*, 569 F.3d at 112 (quoting *Cruz*, 912 F.2d at 11). The Court therefore remands the matter so that the ALJ can further develop the record and reconsider Barker's claims in light of the expanded record. Because Barker's remaining objection concerns the same mental impairments as to which the ALJ must further develop the record and then reconsider, the Court does not address that argument at this time.

## II.     ANALYSIS

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 686 F.2d 751, 755 (2d Cir. 1982)); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (same); 42 U.S.C. § 423(d)(5)(B) (requiring that the Commissioner, before rendering any eligibility determination, "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination").  Thus, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).  On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" *Id.* at 79 n.5 (quoting *Perez*, 77 F.3d at 48).

The Social Security Administration's own regulations reflect this duty, stating that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d)(1).  The regulations further explain that "every reasonable effort" means that "we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence." *Id.* at

13

§ 404.1512(d)(1)(i).  If the evidence is not received, "we will make one follow-up request to obtain the medical evidence necessary to make a determination."  *Id.*

Here, the ALJ failed to make "every reasonable effort" to fill an "obvious gap[ ]" in the record.  In October and December 2015, Dr. Santa Maria administered an extensive battery of psycho-cognitive tests, *see* Docket Item 8 at 576-77, but only a portion—what exact portion is unclear—of Dr. Santa Maria's report was included in the record.  Significantly, the record does not include Barker's complete results on these tests or Dr. Santa Maria's assessment of those results.  *See Sweeting v. Colvin*, No. 12-CV-917 (DNH/CFH), 2013 WL 5652501, at *4 (N.D.N.Y. Oct. 15, 2013) ("To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician." (quoting *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).  What is more, this was apparently the most recent psychological evaluation at the time of the hearing.

Indeed, the ALJ explicitly acknowledged that Dr. Santa Maria's "report [was] incomplete."  Docket Item 8 at 45.  But then, instead of obtaining the complete report or at least contacting Dr. Santa Maria to get more information, the ALJ simply "accord[ed] no particular weight to the incomplete report."  *Id.*  The ALJ's failure to make any effort to obtain the complete evaluation from Dr. Santa Maria requires remand for further development of the record.

Similarly, the ALJ failed to make a "reasonable effort" to obtain a complete copy of the medical evaluation accompanying Chautauqua County DSS's 2013 work

14

exemption notification. Significantly, the portion of the evaluation included in the record does not indicate the identity or qualifications of the evaluator, leaving open the question of whether it was composed by an "acceptable medical source," and therefore perhaps entitled to controlling weight. *See Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight. 'Acceptable medical sources' are further defined (by regulation) as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists." (citing 20 C.F.R. § 416.913(a) and SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2009)).

Without information identifying the DSS evaluator, this Court cannot determine whether substantial evidence supports the ALJ's decision to assign only "little weight" to that opinion. *Id.* at 44; *see also Aung Winn v. Colvin*, 541 Fed. Appx. 67, 70 (2d Cir. 2013) (summary order) (explaining that, in weighing the evidence, the ALJ must make specific findings and "conduct a distinct analysis that would permit adequate review on appeal" (quoting *Kohler v. Astrue*, 546 F.3d 260, 267 (2d Cir. 2008))). Furthermore, because the DSS evaluator opined that Barker was "moderately limited" in the areas of "performing complex tasks independently," "maintaining attention and concentration for rote tasks," "attending to a routine and maintaining a schedule," and "low stress and simple tasks," *see* Docket Item 8 at 292, the ALJ's procedural error was to Barker's detriment and accordingly requires remand. On remand, the ALJ should take reasonable steps to obtain the complete Chautauqua County DSS medical evaluation.

Barker also argues that the ALJ failed to adequately explain why she rejected portions of Dr. Luna's opinion in determining Barker's RFC. *See* Docket Item 13-1 at

15

13-18. According to Barker, the ALJ was required to explain why she disregarded those portions of Dr. Luna's opinion pertaining to the areas of making appropriate decisions, appropriately dealing with stress, and need for supervision, given that the ALJ elsewhere accorded "considerable weight" to Dr. Luna's opinion.

Because the Court has determined that remand is appropriate to further develop the record, it declines at this time to evaluate Barker's second objection. *See Bonet ex rel. T.B. v. Colvin*, No. 1:13-CV-924, 2015 WL 729707, at *7 (N.D.N.Y. Feb. 18, 2015). ("Given the need to apply the proper legal standard, the Court will decline at this time to consider whether substantial evidence exists to support the findings the ALJ made."). On remand, the ALJ should reassess Barker's RFC in light of the complete record. Should she "choose[ ] to adopt only portions of a medical opinion"—whether Dr. Luna's or that of any other medical source—the ALJ "must explain [her] decision to reject the remaining portions." *Raymer v. Colvin*, 14-CV-6009P, 2015 WL 5032669 at *6 (W.D.N.Y. Aug, 25, 2015) (citing *Younes v. Colvin*, 14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). Similarly, "[b]ecause stress is 'highly individualized,'" the ALJ must "make specific findings about the nature of [Barker's] stress, the circumstances that trigger it, and how those factors affect [her] ability to work." *Stadler v. Barnhart*, 464 F.Supp.2d 183, 189 (W.D.N.Y. 2006) (citing SSR 85-15, 1985 WL 56857 (Jan. 1, 1985); *Welch v. Chater*, 923 F. Supp. 17, 21 (W.D.N.Y. 1996)).

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 15, is DENIED, and Barker's motion for judgment on the pleadings, Docket Item 12, is GRANTED in part and DENIED in part. The decision of

16

the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated: November 1, 2019
Buffalo, New York

*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE